**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL ROSE and TIMOTHY STRATTON**, individually and on behalf of all others similarly situated, | ) ) ) | **MDL No. 2492** |
| | ) | |
| | ) | **Master Docket No. 16-cv-08727** |
| Plaintiffs, | ) ) | |
| | ) | **Original N.D. Ill. Docket No. 17-cv-1402** |
| v. | ) | |
| | ) | **Judge John Z. Lee** |
| NATIONAL COLLEGIATE | ) | |
| ATHLETIC ASSOCIATION and | ) | **Magistrate Judge David M. Weisman** |
| BIG TEN CONFERENCE | ) | |
| | ) | **[This Document Relates to Injury Litigation -** |
| | ) | **Single Sport/Single School (football)]** |
| Defendants. | ) | |

<u>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

NOW COME the Plaintiffs, MICHAEL ROSE and TIMOTHY STRATTON,

individually and on behalf of all others similarly situated, by and through their attorneys,

DIBELLA & DIBELLA, P.C., DIBELLA LAW FIRM, P.C., and HEALY LAW OFFICE, and

complaining against Defendants, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

("NCAA") and BIG TEN CONFERENCE ("BIG TEN"), state as follows:

Plaintiffs bring this Class Action Complaint and Demand for Jury Trial against

Defendants NCAA and BIG TEN to obtain redress for all persons injured by Defendants'

disregard for the health and safety of generations of Purdue University student-

athletes.  Plaintiffs allege as follows upon personal knowledge as to themselves and their own

experiences and, as to all other matters, upon information and belief, including investigation

conducted by their attorneys.

1

## INTRODUCTION

1.      Nearly one hundred thousand student-athletes sign up to compete in college football each year because football is America's sport.  Plaintiffs and a Class of football players (defined below) were raised to live and breathe the game.

2.      During the football season, millions of Americans watch college football games on television.  Meanwhile, colleges across the nation pack their stadiums with tens of thousands of live fans.

3.      Before each game, these young players are riled up and encouraged to do whatever it takes to win: to win for the team, for the school, for the conference, for their friends and families.  They are reminded to "make us proud."  When they take to the field, these student-athletes are motivated to push their bodies to the limit, to "shake off" pain, to never give up.  They are playing a role akin to modern-day gladiators that Americans love to watch.

4.      While the players competed and the fans cheered for more, Defendants BIG TEN and the NCAA kept critical information in the dark concerning an epidemic that was slowly injuring and killing their student-athletes.

5.      During the course of a college football season, student-athletes can receive more than 1,000 impacts greater than 10g's (units of gravitational force).  The majority of football-related hits to the head exceed 20g's, and some approach 100g's.

6.      A researcher at the University of North Carolina's Sports Concussion Research Program compared the impacts sustained in a routine college-football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100[g']s: in effect, the player [who sustained two hits above 80g's,] had two car accidents that morning"(Malcolm

2

Gladwell, Offensive Play, *The New Yorker* (Oct. 19, 2009)

(http://www.newyorker.com/magazine/2009/10/19/offensive-play.)

7.     When added up, each season these young college athletes (ranging from 18 to 22 years of age) are subjected to the equivalent of countless numbers of car accidents.

8.     These repetitive, violent impacts to players' heads lead to repeated concussions that severely increase their risks of long-term brain injuries, including memory loss, depression, anxiety, Chronic Traumatic Encephalopathy ("CTE"), Alzheimer's disease, Parkinson's disease, dementia, and other related diseases and symptoms.

9.     Long after these student-athletes play their last game, they are left to face a new battle: coping with the insidious neurological events that are slowly taking over their brains.

10.    For decades, Defendants, BIG TEN and the NCAA, knew about the debilitating effects of concussions, concussion-related injuries, and sub-concussive injuries that result from playing college football, but somehow, that knowledge did not make its way down to the schools, the football programs, and the players.

## PARTIES

11.    Plaintiff, MICHAEL ROSE, is a natural person and a citizen of the State of Ohio.

12.    Plaintiff, TIMOTHY STRATTON, is a natural person and a citizen of the State of Illinois.

13.    Defendant, BIG TEN, is a collegiate-athletic conference with its principal office located at 5440 Park Place, Rosemont, Illinois 60018 and with member institutions in multiple states.

14.    Defendant, BIG TEN, conducts business throughout this District, the State of Illinois, and the United States.

15. Defendant, NCAA, is an unincorporated association with its principal office located at 700 West Washington Street, Indianapolis, Indiana 46206.

16. Defendant NCAA conducts business throughout this District, the State of Illinois and the United States.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) for the following reasons: at least one member of the Class, which consists of at least 100 members, is a citizen of a state different from Defendants; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and none of the exceptions under that subsection apply to this action.

18. This Court has personal jurisdiction over Defendants because they conduct significant business in this District, including establishing consumer and business contracts here and because the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated in part from this District.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in and/or emanated from this District and because Defendant BIG TEN resides here.

## HISTORICAL AND FACTUAL BACKGROUND

### THE PURDUE UNIVERSITY FOOTBALL PROGRAM IS GOVERNED AND REGULATED BY THE DEFENDANTS NCAA AND BIG TEN

20. Defendant NCAA is the governing body of collegiate athletics that oversees over twenty college sports and over 400,000 students who participate in intercollegiate athletics, including in the BIG TEN and the football program at Purdue University.

21.     According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in improving the experiences of student-athletes – on the field, in the classroom, and in life" (Membership, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (June 8, 2016), http://www.ncaa.org/about/who-we-are/membership.).

22.     To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.

23.     Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known schools, with high ranking teams, larger budgets, better facilities, and more athletics scholarships.

24.     Each NCAA Division is composed of several "conferences" to facilitate regional league play.

25.     Defendant BIG TEN is a conference that was established in 1896. The BIG TEN promulgates rules, handbooks, and regulations for its member schools in order to regulate these member schools' athletic departments.

26.     Each member school, and each of the member school's athletes, agree to abide by the rules and regulations issued by the NCAA and BIG TEN.

27.     Purdue University is an original and current member school of the BIG TEN conference and a member of Division I.

28.     Collectively, Defendants govern and regulate the Purdue University football program.

### DEFENDANTS NCAA AND BIG TEN ARE CHARGED WITH SAFE-GUARDING THE HEALTH AND WELL-BEING OF PURDUE FOOTBALL STUDENT-ATHLETES

29.     Since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the

well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life" (regarding the NCAA, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (June 8, 2016), http://www.ncaa.org/about).

30.     The IAAUS was specifically formed for the above-stated purpose because, at the turn of the 20th Century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. As a result of several meetings of colleges, the association was established (in 1910, the IAAUS changed its name to the National Collegiate Athletic Association).

31.     The overarching principles of the NCAA, including its purported commitment to safeguarding its student-athletes, are contained in the NCAA Constitution.

32.     The NCAA Constitution indicates that the purpose of its Association is, among others, to initiate, stimulate and improve intercollegiate athletics programs for student athletes and uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the Association's constitution and bylaws.  NCAA Const., Art. 1, § 1.2.

33.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

34.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

2.2 The Principle of Student-Athlete Well-Being.

Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)

35.     To accomplish this purported purpose, NCAA promulgates and implements standard-sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety.

36.     NCAA member institutions, including athletic conferences like the BIG TEN, are required to abide by the NCAA rules and requirements. Specifically, according to the NCAA Constitution: "[e]ach institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

37.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation" (*See*, *e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at* https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.).

7

38.     To provide member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that the "Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations. . . ." NCAA Const., Art. 2, § 2.8.2.

39.     Likewise, according to the NCAA Constitution, member "conferences of [the NCAA] agree to administer their athletics programs in accordance with the constitution, bylaws and other legislation of the Association." NCAA Const., Art. 3, § 3.3.4.1.

40.     The NCAA therefore holds itself out as a proponent of, and authority on, the treatment and prevention of sports-related injuries upon which the student-athletes, member institutions, and member conferences can rely.

41.     As a member conference, BIG TEN is charged with implementing and enforcing those guidelines in a meaningful way to protect the health and safety of Purdue University football players, including Plaintiffs.

42.     As compared to Plaintiffs and other Purdue University football players, Defendants were in a superior position to know of and mitigate the risks of concussions and other traumatic brain injuries ("TBIs").

## DECADES OF STUDIES ESTABLISH THE DANGERS ASSOCIATED WITH FOOTBALL-RELATED CONCUSSIONS

43.     Throughout the twentieth century and into the twenty-first century, studies have established that repetitive and violent impacts to the head can cause concussions and create a heightened risk of long term effects, including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, and other related diseases and symptoms.

44.     When a student-athlete suffers a severe impact to the head, they may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- feeling overly tired;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech;

- difficulty concentrating or decision-making;

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; or

- memory loss, such as trouble remembering things that happened right before and after the injury.

45.     A student-athlete may not recognize the signs or symptoms of a concussion.  The symptoms themselves may prevent a player from recognizing he has a concussion.

46.     After a concussion, the brain needs time to heal to prevent long-term damage. Doctors generally prohibit individuals from returning to normal activities for some time after a concussion, due to the brain's particular vulnerability to further injury.

47.     The length of the healing process varies by person and by concussion. Symptoms may last for one or two weeks.

48.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent.

49.     Scientific research demonstrates that the effects of concussions are anything but temporary or short-term.

50.     Two leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute.

51.     These studies showed the "devastating consequences" of repeated concussions, noting that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, with corresponding build-up of abnormal proteins in the brain.

52.     Between 2002 and 2007, Dr. Omalu of the Brain Injury Research Institute, examined posthumously the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters and Nash committed suicide, Webster—homeless and cognitively impaired—died of heart failure, and Strzelcyyk died in a collision while driving the wrong way down a highway at 90 miles per hour.  Four of the five brains indicated signs of CTE, which is found in people with a history of repetitive brain trauma.

53.     Dr. Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players.  He has found CTE in 79% of all autopsied brains of former football players (who played at *any* level).

54.     Studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—are studies that build upon studies that date back to the early twentieth century.

55.     Studies on brain injuries suffered by boxers in the 1920s found that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

56.     For instance, in 1928, pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.  *See* Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

57.     Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries and who were displaying signs of dementia and impairment of motor function.

58.     As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline.

59.     Nearly a decade after Dr. Martland's study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play.

60.     In 1952, an article published in the *New England Journal of Medicine* first recommended a three-strike rule for concussions in football, which recommended that players cease to play football permanently after receiving their third concussion.

61.     In a 1967 study, Drs. Hughes and Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").

62.     Shortly after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is re-injury to an already-concussed brain that triggers swelling that the skull cannot accommodate.

63.     Study after study published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet*

11

warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potentially dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons in the nerves of the brain;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

64.     As a result of these and countless other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

65.     By 1991, Dr. Cantu, the American Academy of Neurology, and the Colorado Medical Society developed return-to-play criteria for football players suspected of sustained head injuries.

66.     In 2003, an NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries.

67.     Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural

instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks" (Michael McCrea, *et al.*, Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study, *The Journal of the American Medical Association* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668).

68.     Following these studies, a National Athletic Trainers' Association position statement in 2004 recommended baseline cognitive and postural-stability testing, as well as return-to-play recommendations including holding out athletes who exhibit symptoms of a suspected head injury.

69.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports.  These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

70.     It was not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time passing legislation that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

71.     Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

72.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

73.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.  In the end, these (still deficient) policies were implemented far too late for Plaintiffs and the Class, who suffered reasonably foreseeable harm as a result of the actions and inaction of the NCAA and BIG TEN.

**FACTS SPECIFIC TO PLAINTIFF ROSE**

74.     Plaintiff MICHAEL ROSE played football from 1996-1999 (when he was 19 to 22 years of age) at Purdue University in the position of linebacker.

75.     ROSE was considered smaller for his position as a Division I, BIG TEN linebacker, weighing between 205 and 220 pounds, but what he lacked in size, he made up with intensity.

76.     In an interview with the Purdue University press in his senior year, Mike was quoted as saying, "I'm always running around out there, throwing my body around.  I think a lot of people that watch me play enjoy that part of my game. That's what I have to do being a smaller player on the field."  *See* http://www.purduesports.com/sports/m-footbl/spec-rel/091099aaa.html.

77.     In that same interview, ROSE was asked what it was like for him as a freshman going up against the veterans in practice.  He was quoted as saying, "[m]y freshman year…[w]e had a tempo drill that a linebacker would have to break-through some of the biggest guys on the

14

team. The older guys always liked to pick on freshmen, and I had to go up against Jon Krick, Leo Perez, and Greg Smith [280-pound-plus guys]. I went flying into Krick and my chinstrap busted off, Greg Smith was next and my helmet flew off, everybody was going nuts and I kept on going. I ran right into Leo with my face into his facemask and I busted my nose, blackened my eye, and I have a scar to prove it."

78. In that same interview, ROSE was quoted as saying, "I have played every game since my sophomore year like it's my last. I don't hold anything back and when you are out there flying around you're more likely to hurt somebody else other than yourself."

79. ROSE earned the title of BIG TEN Conference "Defensive Player-of-the-Week."

80. Between 1996 and 1999, ROSE was subjected to repeated impacts to the head in practices and games, and suffered numerous concussive and sub-concussive injuries each year as a result.

81. Over time, ROSE began to experience the consequences of these concussions. Today, he struggles with ringing in the ears, memory loss, depression, abrupt and uncontrollable changes in mood, and a cluster of other debilitating symptoms related to the long-term effects of repetitive head trauma.

82. During the time ROSE played football at Purdue University, the school did not receive any concussion-management protocols or policies from the NCAA or BIG TEN. Likewise, during that time, Purdue University did not receive any return-to-play guidelines from Defendants.

83. While ROSE was subjected to repetitive blows to the head in practices and games, he was never made aware of the short-term and long-term health risks associated with repetitive head trauma, was never furnished with appropriate health and safety protocols that would

15

monitor, manage, and mitigate risks associated with repetitive head trauma, and he was never educated about the same so that he might make an informed decision as to whether, or how, he would play the game.

84.  During the time in which ROSE played football for Purdue University, Defendants failed to disclose and furnish to Purdue University the overwhelming amount of medical evidence in its possession regarding repetitive head trauma.

85.  ROSE was never concussed in high school and never played professional football.

## FACTS SPECIFIC TO PLAINTIFF STRATTON

86.  Plaintiff TIMOTHY STRATTON played football from 1998-2001(when he was 19 to 22 years of age) at Purdue University in the position of tight end.

87.  STRATTON was a favorite target of quarterback Drew Brees.  He compiled 38 catches in his freshman year, given Honorable Mention All-BIG TEN and named to the Sporting News Freshman All-American team.  He followed up with 49 catches in his sophomore year, and was named First Team All-BIG TEN.  In his junior year he had 56 receptions and named First Team All-BIG TEN, named to the BCS All America Team, and won the inaugural John Mackey Award, given to the nation's top tight end.  In his senior year, STRATTON caught 47 passes and was named First Team All-BIG TEN.

88.  By the time STRATTON finished his career at Purdue, he was the school's all-time leader in receptions at 204.

89.  Between 1998 and 2001, While STRATTON was earning awards, he was also experiencing repeated impacts to the head in practices and games, and suffered numerous concussive and sub-concussive injuries each year as a result.

16

90.     Over time, STRATTON began to experience the consequences of these concussions. He struggles today with headaches, migraines, ringing in the ears, memory loss, depression, anxiety, anger, and a cluster of other debilitating symptoms related to the long-term effects of repetitive head trauma.

91.     During the time STRATTON played football at Purdue University, the school did not receive any concussion-management protocols or policies from the NCAA or BIG TEN. Likewise, during that time, Purdue University did not receive any return-to-play guidelines from Defendants.

92.     While STRATTON was subjected to repetitive blows to the head in practices and games, he was never made aware of the short-term and long-term health risks associated with repetitive head trauma, was never furnished with appropriate health and safety protocols that would monitor, manage, and mitigate risks associated with repetitive head trauma, and he was never educated about the same so that he might make an informed decision as to whether, or how, he would play the game.

93.     During the time in which STRATTON played football for Purdue University, Defendants failed to disclose and furnish to Purdue University the overwhelming amount of medical evidence in its possession regarding repetitive head trauma.

94.     STRATTON was never concussed in high school and never played professional football.

## CLASS ACTION ALLEGATIONS

95.     Plaintiffs brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and a Class defined as follows: all individuals who participated in

Purdue University's NCAA-sanctioned football program between 1952 and 2010 and experienced head trauma due to their play in said program.

96.     The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

97.     **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of Purdue University football players fall into the definition of the Class.  Members of the Class can be identified through Defendants' records.

98.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members.  Common questions for the Class include, but are not limited to the following:

> a.  Whether Defendants had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

> b.  Whether Defendants had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related traumatic brain injuries;

> c.  Whether Defendants' conduct constitutes a breach of duty;

    d.   Whether Defendants' conduct constitutes negligence;

    e.   Whether Defendants' conduct constitutes a breach of contract;

    f.   Whether Defendants' conduct constitutes fraudulent concealment;

    g.   Whether Defendants were unjustly enriched at the expense of Plaintiffs and the Class; and

    h.   Whether Plaintiffs and the Class are entitled to compensatory damages and equitable relief.

99.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, as Plaintiffs and other members sustained damages arising out of the same wrongful conduct of the same Defendants.  Further, the putative Class here all share some or all of the cluster of symptoms, illnesses and diagnoses that arise out of, and are caused by, repetitive head trauma that was experienced in the play of college football.

100.    **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in complex litigation. Plaintiffs have no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.

101.    **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible, or at a minimum financially impractical, for the members of the Class to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual

litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale for time, effort and expense, and comprehensive supervision by a single court.

## COUNT ONE: NEGLIGENCE
(Individually and on Behalf of the Class as Against All Defendants)

102.    Plaintiffs incorporate by reference the foregoing allegations.

103.    From its inception and by virtue of its role as the governing body in college athletics, the NCAA has assumed a duty to protect the health and safety of all student-athletes at member institutions. NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

104.    Defendant BIG TEN shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to football players.

105.    Defendants NCAA and BIG TEN had an additional duty to educate Purdue University and Purdue University football players on the proper ways to evaluate and treat TBI during practice sessions and football games, including repetitive sub-concussive and concussive injury.

106.    Defendants also had a duty to warn student athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

107.    Defendants had a duty not to conceal material information from Purdue University football players, including Plaintiffs.

108.    Defendants' duties extended to the Purdue University football players, by virtue of the players' membership in the conference and by virtue of the players' participation in an NCAA-sanctioned sport.

109.    Defendants breached their duties to Plaintiffs by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in locker rooms, and in the weeks and months after Purdue University football players sustained TBIs, as well as providing treatment for the latent effects of TBI. These failings include, but are not limited to:

a.  failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

b.  failing to inform the student football players of the dangers of concussive and sub-concussive injuries;

c.  failing to implement return-to-play regulations for Plaintiffs who sustained concussive and/or sub-concussive injuries and/or is suspected of sustaining such injuries;

d.  failing to implement and/or enforce procedures to monitor the health of football players who have sustained (or are suspected of sustaining) concussive and/or sub-concussive injuries;

e.  failing to inform the football players' extended families of concussive and/or sub-concussive injuries the student football players had sustained; and

f.  failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time Plaintiffs left Purdue University.

110.    Defendants breached their duties to Plaintiffs and the Class by failing to disclose: (a) material information they possessed or should have possessed regarding the long-term risks and effects of repetitive head trauma; (b) the dangers of concussive and sub-concussive injuries;

and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to student football players.

111.    The concealed information was such that Plaintiffs and the Class would have acted differently if they had been aware of the material facts known to, and concealed by, Defendants.

112.    Had Plaintiffs and members of the Class known the full facts in Defendants' possession, they would (i) not have continued to play after an injury, (ii) would have taken additional time to allow their brain injuries to heal before returning to play, (iii) would have taken additional precautions while playing football, or (iv) would not have continued to play college football at all.

113.    As a direct and proximate result, Plaintiffs experienced repetitive sub-concussive and concussive brain impacts during their college football career that significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

WHEREFORE, the Plaintiffs and all others similarly situated, by and through their attorneys, pray for judgment against Defendants for the full measure of damages allowed under applicable law, including but not limited to interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT TWO: FRAUDULENT CONCEALMENT
(Individually and on Behalf of the Class as Against All Defendants)

114.    Plaintiffs incorporate by reference the foregoing allegations.

115.    Defendants knew that repetitive head impacts in football games and full-contact practices created a risk of harm to student-athletes that was similar or identical to the risk boxers faced when receiving repetitive impacts to the head during boxing practices and matches.

116. Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Complaint, which detailed the serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which Purdue University football players were exposed.

117. Defendants were willfully blind to and/or knowingly concealed from Plaintiffs and the Class the risks of TBI in NCAA football games and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

118. Through concealment of material facts, Defendants intended to induce a false belief, under circumstances creating a duty to speak. Defendants intended to induce a false belief that Plaintiffs and the Class should continue to play football and should not be prevented from playing football after a concussion or several concussions that should have required time to heal.

119. Plaintiffs and the Class could not have reasonably been expected to know or discover the truth about the risks associated with sub-concussive or concussive injuries, or were prevented or misled from obtaining such truthful information. Plaintiffs and the Class were under the care and treatment of Defendants and justifiably relied on their silence as representing facts that did not exist.

120. Given Defendants' superior and unique vantage point, Plaintiffs reasonably looked to Defendants for guidance on head injuries and concussions, including the later-in-life consequences of the repetitive head impacts they sustained while football players at Purdue University.

121. The concealed information was such that Plaintiffs and the Class would have acted differently if they had been aware of the material facts known to, and concealed by,

Defendants. Had Plaintiffs and members of the Class known the full facts in Defendants' possession, they would (i) not have continued to play after an injury, (ii) would have taken additional time to allow their brain injuries to heal before returning to play, (iii) would have taken additional precautions while playing football, or (iv) would not have continued to play college football at all.

122.    Despite Defendants' knowledge, they failed to act reasonably by developing appropriate guidelines or rules regarding return-to-play criteria and other safety procedures. The Defendants' inaction and concealment increased the risk of long-term injury and illness in their student-athletes.

123.    As a direct and proximate result of Defendants' knowing concealment and/or willful blindness, Plaintiffs suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

WHEREFORE, the Plaintiffs and all others similarly situated, by and through their attorneys, pray for judgment against Defendants for the full measure of damages allowed under applicable law, including but not limited to interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, and for exemplary damages.

### COUNT THREE: BREACH OF EXPRESS CONTRACT
(Individually and on Behalf of the Class as Against Defendant NCAA)

124.    Plaintiffs incorporate by reference the foregoing allegations.

125.    As a football player at Purdue University, an institution governed by the NCAA, Plaintiffs were required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The contract required Plaintiffs to affirm that they read the NCAA regulations and bylaws and required that they agree to abide by same.

126.     In exchange for Plaintiffs' agreements, the NCAA promised to perform certain services and functions, including, among other things:

    a.   conduct intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes;

    b.   require that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and

    c.   require that each member institution establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

127.     By agreeing to abide by NCAA regulations, and thereafter participating in a NCAA-sanctioned sports program in accordance with such regulations, Plaintiffs and the Class fulfilled their contractual obligations to the NCAA.

128.     As described in the foregoing allegations, the NCAA breached the Parties' agreement by failing to ensure that its student-athletes were provided with a safe environment in which to participate in their NCAA sport activities. The NCAA further breached the contract by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

129.     As a direct and proximate result of Defendants' breach, Plaintiffs experienced repetitive sub-concussive and concussive brain impacts during their college football career that significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

WHEREFORE, the Plaintiffs and all others similarly situated, by and through their attorneys, pray for judgment against Defendants for the full measure of damages allowed under

applicable law, including but not limited to interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT FOUR: BREACH OF IMPLIED CONTRACT
### (Individually and on Behalf of the Class as Against all Defendants)

130.     Plaintiffs incorporate by reference the foregoing allegations.

131.     To the extent that an express contract cannot be established among Plaintiffs, the Class, and Defendants, the facts set forth above support the finding of an implied contract.

132.     Under the implied contract, student-athletes agreed to be bound by NCAA and BIG TEN rules and regulations in exchange for their participation in NCAA- and BIG TEN-controlled athletic programs, including the Purdue University football program. As a condition of the implied contract, the NCAA agreed to abide by, and BIG TEN agreed to implement, the promises set forth in its own Constitution and Bylaws, as described above.

133.     Plaintiffs and the Class indicated their acceptance of the contract, and further, fully performed under the contract, by participating in the Purdue University football program in accordance with NCAA and BIG TEN rules and regulations.

134.     Defendants breached their implied contractual duties by failing to ensure that student-athletes were provided with a safe environment in which to participate in football activities. Defendants further breached their contracts by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

135.     As a direct and proximate result of Defendants' breach, Plaintiffs and the Class suffer physical injury and damages in the form of past, ongoing, and future medical expenses,

other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiffs and the Class will likely incur future damages caused by Defendants' breaches.

WHEREFORE, the Plaintiffs and all others similarly situated, by and through their attorneys, pray for judgment against Defendants for the full measure of damages allowed under applicable law, including but not limited to interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

## COUNT FIVE: BREACH OF EXPRESS CONTRACT
(Individually and on Behalf of the Class as Third-Party
Beneficiaries as Against Defendant NCAA)

136.    Plaintiffs incorporate by reference the foregoing allegations.

137.    To the extent that no express or implied contract is found to exist between Plaintiffs and Defendants, an express contract existed between the NCAA and Purdue University. Under the terms of that contract, Purdue University agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

138.    Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, Purdue University and NCAA agreed to, among other things: (1) conduct intercollegiate athletic programs in a manner designed to protect and enhance the physical and educational well-being of student athletes; and (2) protect the health of and provide a safe environment for each of their participating student-athletes.

139.    Plaintiffs and the Class are the intended third-party beneficiaries of the contract between the NCAA and Purdue University. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA Organization.

27

140.     NCAA breached the contractual duties owed to Plaintiffs and the Class under that contract by: (1) failing to implement or require rules-of-play and return-to-play criteria to minimize or prevent the risk of concussions and concussion-related injuries; and (2) failing to adequately inform and educate Purdue University football players on the symptoms and long-term dangers of concussions and concussion-related injuries.

141.     As a direct result of NCAA's breach, Plaintiffs and the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiffs and the Class will likely incur future damages caused by NCAA's conduct.

WHEREFORE, the Plaintiffs and all others similarly situated, by and through their attorneys, pray for judgment against Defendants for the full measure of damages allowed under applicable law, including but not limited to interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

### COUNT SIX: UNJUST ENRICHMENT
#### (*In the Alternative to Breach of Contract*)
(Individually and on Behalf of the Class as Against All Defendants)

142.     Plaintiffs incorporate by reference the foregoing allegations.

143.     Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

144.     Defendants appreciate and have knowledge of such benefits.

145.     Under principles of equity and good conscience, Defendants should not be permitted to retain the revenues they receive at the expense of Plaintiffs and the Class while

refusing to pay for damages, including medical expenses incurred, as a result of their unlawful actions or otherwise failing to prevent such injuries.

WHEREFORE, the Plaintiffs and all others similarly situated, by and through their attorneys, pray for judgment against Defendants for the full measure of damages allowed under applicable law and equity, including but not limited to interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, and restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct alleged herein.

## **PRAYER FOR ADDITIONAL RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, request that the Court enter an Order providing for the following additional relief:

A.     Certify this case as a class action on behalf of the Class defined above, appoint Plaintiffs as Class Representatives, and appoint their counsel as Class Counsel; and

B.     Award such other and further relief as the law, equity and justice may require.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

MICHAEL ROSE and TIMOTHY STRATTON, individually and on behalf of all others similarly situated,

Dated: February 22, 2017            By: /s/ Michael J. DiBella
                                    One of Plaintiffs' Attorneys

Michael J. DiBella
michael@dibellalawyes.com
DiBella Law Firm, P.C.
22 W. Washington, Suite 1500
Chicago, Illinois 60601
Tel: 312.880.9529
Fax: 312.241.1656

Matthew J. Healy
Healy Law Office
1515 Wynkoop Street, Suite 360
Denver, Colorado 80202
P:  303-546-7961
matthew.healy@healy-legal.com

Frank J. DiBella
DiBella & DiBella, P.C.
707 Skokie Blvd., Suite 600
Northbrook, Il 60062
P:  312-372-1440
F:  312-372-1959

Gina M. DiBella
DiBella & DiBella, P.C.
707 Skokie Blvd., Suite 600
Northbrook, Il 60062
P:  312-372-1440
F:  312-372-1959

*Attorneys for Plaintiffs and the Putative Class*

## **CERTIFICATE OF SERVICE**

I, Michael J. DiBella, certify that on February 23, 2017, I served the above and foregoing ***Class Action Complaint and Demand for Jury Trial***, by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Michael J. DiBella