**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL ROSE, and TIMOTHY STRATTON, individually and on behalf of all others similarly situated,** | ) ) ) | **MDL No. 2492** |
| | ) | **Master Docket No. 16 C 8787** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Original N.D. Ill. Docket No. 17 C 1402** |
| | ) | |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and BIG TEN CONFERENCE,** | ) ) ) | **Judge John Z. Lee** |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Michael Rose and Timothy Stratton played football for Purdue University from 1996 to 2001. Purdue is in the Big Ten Conference ("Big Ten"), a Division I conference of the National Collegiate Athletic Association ("NCAA").

Over the course of their college football careers at Purdue, Rose and Stratton experienced thousands of repetitive concussive and subconcussive impacts to their heads. Now they are dealing with debilitating neurodegenerative disorders and cognitive impairments due to repetitive brain trauma. As a result, Rose and Stratton, individually and on behalf of all others similarly situated, have sued for negligence, fraud, breach of express and implied contract, and unjust enrichment, alleging that the NCAA and the Big Ten were uniquely aware of the risks of repetitive brain trauma and, yet, exposed players to those risks with no regard for players' health and safety.

The NCAA and Big Ten have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). In addition, the Big Ten has moved for a more definitive

statement under Rule 12(e). For the reasons herein, the motions are granted in part and denied in part [12][16].

<b><u>Factual Background[1]</u></b>

### *Rose and Stratton at Purdue*

Each Saturday during football season, millions of fans watch college football games from their couches or in packed stadiums throughout the United States. Compl. ¶ 2, ECF No. 1. Nearly one hundred thousand college football players compete each year. *Id.* ¶ 1.

Rose played the position of linebacker for Purdue from 1996 to 1999. *Id.* ¶ 74. Weighing just over 200 pounds, Rose was small for his position. *Id.* ¶ 75. But what Rose lacked in size, he made up in intensity, once earning him the title of Big Ten Defensive Player of the Week. *Id.*

Stratton played the position of tight end for Purdue from 1998 to 2001. *Id.* ¶ 86. By the end of his college career, he was the school's all-time leader in receptions, with 204 in total. *Id.* ¶ 88.

Neither Rose nor Stratton had ever experienced a concussion before playing college football. However, while playing for Purdue in practices and games, both were subjected to thousands of impacts greater than 10 g's ("g" being a measure of gravitational force, where 1 g is equal to the force of gravity at the Earth's surface). *Id.* ¶¶ 5, 80, 85, 89, 94. Generally, the majority of football-related hits to the head exceed 20 g's, and some approach 100 g's. *Id.* ¶ 5.

During the time that Rose and Stratton were playing football at Purdue, the Big Ten and the NCAA did not inform them of an epidemic that was slowly injuring and killing student athletes. *Id.* ¶ 4. The Big Ten and the NCAA knew that repetitive subconcussive and concussive impacts

---

[1] On a motion to dismiss, the district court accepts all facts pleaded as true and draws all reasonable inferences in the plaintiff's favor. *McDonald v. Adamson*, 840 F.3d 343, 345–46 (7th Cir. 2016).

to football players' heads created a serious risk of neurodegenerative disorders and diseases. *Id.* ¶¶ 42, 56–65. But Defendants did not change their concussion treatment protocols until 2010, several years too late for Plaintiffs. *Id.* ¶ 70.

Now, long after their college football days have concluded, Rose and Stratton suffer from neurodegenerative diseases and disorders caused by repetitive brain trauma. *Id.* ¶¶ 80–83, 89–92. Rose deals with ringing in his ears, memory loss, depression, and abrupt and uncontrollable mood swings. *Id.* ¶ 81. Stratton struggles with headaches, migraines, ringing in the ears, memory loss, depression, and anxiety. *Id.* ¶ 90.

### *Defendants' Roles in Safeguarding the Health and Safety of Plaintiffs*

The NCAA was created in 1906 in response to the excessive brutality and alarming rate of head injuries in college football. *Id.* ¶ 30. Thus, the NCAA's original purpose was to create and enforce rules to protect young people from head injuries resulting from dangerous athletic practices. *Id.* ¶¶ 30–31.

To this end, the NCAA Constitution states that its primary principle is to ensure that: "Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes." *Id.* ¶ 34. To carry out this goal, the NCAA promulgates and implements standard-sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which provide detailed instructions on game and practice rules pertaining to player well-being and safety. *Id.* ¶ 35.

Additionally, the NCAA publishes a Sports Medicine Handbook ("Handbook") annually. *Id.* ¶ 37. The Handbook includes official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines. *Id.* These policies and guidelines

recognize that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation." *Id.* As a member conference in the NCAA, the Big Ten is required to comply with, administer, and enforce all applicable NCAA rules, regulations, policies, and guidelines to protect the health and safety of Purdue University football players, including Plaintiffs. *Id.* ¶¶ 36, 39, 41. Furthermore, the NCAA promises to assist the Big Ten in its efforts to fully comply with NCAA rules and regulations. *Id.* ¶ 38. As compared to Plaintiffs and other Purdue University football players, the NCAA and the Big Ten are in a superior position to know of and to mitigate the risks of concussions and traumatic brain injuries. *Id.* ¶ 42.

### *Symptoms and Treatment of Concussive and Subconcussive Impacts to the Head*

When someone suffers a severe impact to the head, they may exhibit: (1) dizziness; (2) tiredness; (3) nausea; (4) vomiting; (5) headaches; (6) blurred vision or light sensitivity; (7) slurred speech; (8) difficulty concentrating or decision-making; (9) difficulty balancing or lack of coordination; (10) unexplained anxiety or irritability; or (11) memory loss. *Id.* ¶ 44. Symptoms may last for one or two weeks. *Id.* ¶ 47. A concussed player, however, may not recognize the signs of a concussion, and the symptoms themselves may prevent him from recognizing he has suffered a concussion. *Id.* ¶ 45.

After a person experiences a concussion, his or her brain needs time to heal to prevent long-term damage. *Id.* ¶ 46. After diagnosing a patient with a concussion, doctors generally prohibit him or her from returning to normal activities for a few weeks after a concussion, due to the brain's particular vulnerability to further injury. *Id.* ¶ 47. Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. *Id.* ¶ 48. The symptoms of post-concussion syndrome can last for months or can be permanent. *Id.*

When a football player experiences minor, subconcussive brain trauma, he may not exhibit symptoms of a concussion. *Id.* ¶ 63. However, even minor brain trauma may eventually lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials, and reduced speed of information processing. *Id.*

### *Studies Establishing the Dangers Associated with Football-related Brain Trauma*

Plaintiffs cite numerous studies regarding the risks associated with football-related brain trauma. *Id.* ¶¶ 43–67. Plaintiffs allege that the NCAA and the Big Ten were in a comparatively superior position than football players to know about these studies. *Id.* ¶ 42.

For example, in 1952, an article published in the New England Journal of Medicine recommended a three-strike rule for concussions in football, which recommended that players cease to play football permanently after the third concussion. *Id.* ¶ 60. In a 1967 study, Drs. Hughes and Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs"). *Id.* ¶ 61. Shortly thereafter, doctors identified a potentially fatal condition known as "Second Impact Syndrome," referring to a condition when additional injury to an already-concussed brain triggers swelling that the skull cannot accommodate. *Id.* ¶ 62.

In addition, studies conducted by Boston University concluded that repeated concussions trigger progressive degeneration of brain tissue and lead to an increased risk of depression, dementia, and suicide. *Id.* ¶¶ 50–51. Furthermore, autopsies of former football players' brains have shown that 96% of National Football League ("NFL") players had Chronic Traumatic Encephalopathy ("CTE"), a debilitating condition found in those with a history of repetitive brain

trauma. *Id.* ¶ 53. CTE was found in 79% of all autopsied brains of former players who played at any level of football. *Id.*

Furthermore, numerous other studies have been published in medical journals warning of the dangers of single concussions, multiple concussions, and football-related head trauma from multiple concussions. *Id.* ¶ 63. For instance, studies have shown that repetitive subconcussive and concussive impacts to the head create a serious risk of long term effects, including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, and other related diseases and symptoms. *Id.* ¶ 43. As a result of these and numerous other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled. *Id.* ¶¶ 64–65.

Plaintiffs assert that, despite the scientific evidence throughout the years regarding concussions, the NCAA did not conduct its own concussion-related studies until 2003. *Id.* ¶¶ 66–67. One of these studies concluded that football players who had previously sustained a concussion were more likely to have future concussion-related injuries. *Id.* ¶ 66. Another NCAA study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks." *Id.* ¶ 67. Nevertheless, the NCAA and the Big Ten did not change their concussion treatment protocols until 2010. *Id.* ¶ 70.

### Plaintiffs' Claims and Defendants' Rule 12 Motions

Plaintiffs have filed a six-count complaint, asserting state common law claims of negligence (Count 1), fraudulent concealment (Count 2), breach of express contract (Count 3), breach of implied contract (Count 4), breach of express contract as third-party beneficiaries (Count

5), and unjust enrichment (Count 6).  The Big Ten moves to dismiss the complaint based on the statute of limitations and raises additional arguments as to the fraudulent-concealment, breach-of-implied-contract, and unjust-enrichment claims.  The NCAA moves to dismiss all but the negligence claim.

## Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Additionally, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013).  At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678).

Under Rule 9(b), a plaintiff "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  A plaintiff must describe the "who, what, when, where, and how" of the fraud—"the first paragraph of any newspaper story." *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (internal quotation marks omitted).  "A plaintiff who alleges fraud can provide all the detail in the world, but does not have unlimited leeway to do so on 'information and belief.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). "The general rule that fraud cannot be pled based on information and belief is not ironclad, however:  the practice

is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id. at* 443 (internal quotation marks omitted).

<u>Analysis</u>

## I.      Choice of Law

Because this Court sits in diversity, it must first address choice of law. *Heiman v. Bimbo Foods Bakeries Distrib, Co.*, ___ F.3d ____, No. 17-3366, 2018 WL 4139785, at *2 (7th Cir. Aug. 30, 2018). To determine which state's law governs, the Court looks to the choice-of-law rules of the forum state, Illinois. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Under Illinois choice-of-law rules, litigants can formally or informally stipulate to the substantive law to be applied to their case, as long as the stipulation is reasonable." *Haskins v. Midwest Air Traffic Control Serv., Inc.*, No. 12 CV 4584, 2016 WL 3653531, at *1 (N.D. Ill. July 8, 2016) (citing *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 n.6 (7th Cir. 1995)).

The parties agree that Illinois substantive law applies to their claim for breach of contract as third-party beneficiaries to a contract and that Indiana supplies the substantive law for the other claims that are the subject of the motions. This stipulation is reasonable. The parties assert there is no difference between Illinois and Indiana law regarding breach of contract as third-party beneficiaries, and thus the law of the forum state applies. *See Nationwide Advantage Mortg. Co. v. GSF Mortg. Corp.*, 827 F.3d 577, 580 (7th Cir. 2016). Furthermore, as to the other claims, both Plaintiffs played football while attending Purdue University in West Lafayette, Indiana, so it is reasonable for Indiana law to govern those claims. Accordingly, the Court applies the substantive law in accordance with the parties' stipulations. *See Bandag, Inc. v. Nat'l Acceptance Co. of Am.*,

855 F.2d 491, 493 (7th Cir. 1988) ("When the parties agree on choice of law, we need not address the issue further.").

"Procedural questions, however, are governed by the law of the forum." *Heiman v. Bimbo Foods Bakeries Distrib. Co.*, No. 17 CV 4065, 2017 WL 4682732, at *3 (N.D. Ill. Oct. 18, 2017), *aff'd*, 2018 WL 4139785, at *3. Illinois choice-of-law rules consider statutes of limitations to be procedural in nature. *Id.*; *F.D.I.C. v. Wabick*, 335 F.3d 620, 627 (7th Cir. 2003); *Newell Co. v. Petersen*, 758 N.E.2d 903, 908 (Ill. App. Ct. 2001). The Court therefore applies Illinois' statute of limitations, along with its accrual rules and tolling doctrines.

## II.    Illinois Statute of Limitations

The Court pauses briefly to determine which statute of limitations applies to each of Plaintiffs' various claims. In Illinois, "[t]he law is well established that the limitations period governing a claim is determined by the nature of the plaintiff's injury rather than the nature of the facts from which the claim arises." *Doe A. v. Diocese of Dallas*, 917 N.E.2d 475, 487 (Ill. 2009). In each of their claims, Plaintiffs allege that the nature of their injury is in the form of personal injury damages. *See* Compl. ¶¶ 113, 123, 129, 135, 141, 145. The Big Ten and Plaintiffs agree that all of Plaintiffs' claims are governed by Illinois' statute of limitations for personal injury actions. *See* Def. Big Ten's Mem. Supp. Mot. Dismiss at 3–4, Docket No. 17 C 1402, ECF No. 13; Pls.' Combined Resp. Defs.' Mot. Dismiss at 4–8, Docket No. 17 C 1402, ECF No. 38. As a result, the applicable statute of limitations for all claims is two years. *See* 735 Ill. Comp. Stat. 5/13-202.

"Because complaints need not anticipate and attempt to plead around defenses, a motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative

defense." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014) (citations and internal quotation marks omitted). In other words, "[o]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

The Big Ten argues it is clear from the face of the complaint that Plaintiffs' claims are time-barred and that delayed accrual is inappropriate under Illinois' discovery rule and fraudulent concealment doctrine. Not surprisingly, Plaintiffs disagree.

### A. The "Sudden, Traumatic Event" Rule

Under Illinois law, "[t]he statute of limitations does not begin to run until the wronged 'person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. At that point the burden is upon the injured person to inquire further as to the existence of a cause of action.'" *Halperin v. Halperin*, 750 F.3d 668, 671 (7th Cir. 2014) (quoting *Witherell v. Weimer*, 421 N.E.2d 869, 874 (Ill. 1981)). "In determining when a plaintiff reasonably should have discovered her injury, Illinois courts distinguish between injuries caused by sudden, traumatic events and those that have a late or insidious onset." *Hollander v. Brown*, 457 F.3d 688, 692 (7th Cir. 2006) (internal quotation marks omitted).

"[A] sudden, traumatic event is one that, because of its force or violence, permits the law to presume that the event immediately placed the plaintiff on notice of her injury and a right of action." *Id.* (internal quotation marks omitted). In such a case, the "cause of action accrues on the date of the traumatic event, and the limitations period does not begin anew simply because a latent condition later may arise from the same occurrence." *Id.* "The rationale supporting this rule is that the nature and circumstances surrounding the traumatic event are such that the injured party

is thereby put on notice that actionable conduct might be involved." *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 899 (Ill. 1995).

As the Big Ten sees it, Plaintiffs are claiming that they were injured in a sudden, traumatic event each and every time they experienced a concussive or subconcussive hit. Under this scenario, the Big Ten argues, Plaintiffs have pleaded themselves out of court because their causes of action accrued, and the statute of limitations began to run, when those injuries occurred between 1996 and 2001 while they were playing football at Purdue.

To support this argument, the Big Ten cites to *Golla v. General Motors Corp.*, 657 N.E. 2d 894. In *Golla*, the plaintiff, who was driving a car, collided with another. *Id.* at 895–96. As a result of the collision, her seat slid forward violently, and the seatbelt caused trauma to her left shoulder. *Id.* She was treated for injuries the same day, but she developed a nerve disorder in her left shoulder and sued General Motors more than two years after the accident, claiming that the car seat was defective. *Id.* at 896. The Illinois Supreme Court affirmed the grant of summary judgment for the defendant, holding that the plaintiff should have filed suit within two years of the accident under the "sudden, traumatic event" rule. *Id.* at 899.

In so holding, the *Golla* court discussed the development of the rule, highlighting its prior holdings in *Williams v. Brown Manufacturing Co.*, 261 N.E.2d 305 (Ill. 1970), and *Berry v. G.D. Searle & Co.*, 309 N.E.2d 550 (Ill. 1974). The *Golla* court pointed out that, in *Williams*, it had stated that a products liability action "to recover for personal injuries resulting from a sudden traumatic event accrues *when plaintiff first knew of his right to sue, i.e., at the time when the injury occurred.*" *Id.* at 898 (quoting *Williams*, 261 N.E.2d at 313) (emphasis in original). The *Golla* court also noted that the *Berry* plaintiff, who claimed that defective birth control pills had caused

a stroke, "knew she was ill, that she had suffered a stroke and was partially and permanently paralyzed." *Id.* at 899.

The *Golla* court then turned to the case before it, noting that the plaintiff "knew, at that time [of the accident], that she suffered an injury and that the injury may have been wrongfully caused." *Id.* at 899. Finally, the *Golla* court contrasted the case before it with so-called "nontraumatic event" cases, such as those involving asbestos exposure and medical malpractice claims, where the plaintiffs "knew of an injury [at the time of the event] but did not know, or have reason to know, that the injury was wrongfully caused." *Id*. at 902.

For its part, the Big Ten likens the events in this case to those in *Golla*, citing to the allegations comparing the force a football player experiences during games and practice to the force one experiences in a car accident. *See* Compl. ¶¶ 6–8. But, rather than focusing only on a few, discreet allegations, the Court must consider the complaint as a whole. *See Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011). And, here, assuming all of the well-pleaded allegations to be true and viewing all reasonable inferences in Plaintiffs' favor, the Court concludes that their allegations, taken as a whole, paint a picture that falls more within the "nontraumatic event" category of cases than the "sudden, traumatic event" category described in *Golla*.

For example, Plaintiffs assert that, as a result of the hits they suffered and Defendants' inaction, they—as college athletes barely over 18 years old—experienced an increased risk of developing neurodegenerative diseases and disorders caused by repetitive and cumulative brain trauma, a risk of which they were unaware. Compl. ¶¶ 8, 74, 80–84, 86, 89–93, 129. Plaintiffs also assert that many players may not have even realized they had been injured, because Defendants failed to recognize—let alone treat—concussions, and that the after-effects of concussions prevented players from even perceiving that they had been concussed. *Id.* ¶¶ 45, 70–

73, 82–84, 91–93, 106, 109, 122–23.  In addition, Plaintiffs allege that players may display no immediately noticeable symptoms at all.  *Id.* ¶¶ 9, 63; 106, 109(f).  They were never provided the tools to monitor the risks caused by these hits, *id.* ¶¶ 45, 68–71, 82–83, 91–92, and it was only over time that they began to experience the consequences, *id.* ¶¶ 9, 81, 90.

Given these allegations, the Court cannot conclude from the complaint that Rose and Stratton "knew, at the time, that [they] suffered an injury *and* that the injury may have been wrongfully caused," as required by the Illinois Supreme Court in *Golla*, 157 N.E.2d at 899 (emphasis added).  To the contrary, Rose and Stratton allege that the Defendants hid the risk of such injuries from them.  *See id.* ¶¶ 10, 115–117.

The Big Ten also argues that a reasonable person in Plaintiffs' position would have been aware of their causes of action at the time, based on the existence of the well-publicized scientific studies on concussions between 2002 and 2007, *id.* ¶¶ 50–52, and the NCAA's amendment of its concussion policy in 2010, *id.* ¶¶ 70–73.  Additionally, the Big Ten imputes knowledge of concussion-based lawsuits filed by college football player Adrian Arrington against the NCAA in 2011, and by professional football players against the NFL in 2015.  But nowhere in their complaint do Plaintiffs state that they were aware of these studies or policies or any of the other lawsuits during the statute of limitations period.

Of course, discovery may reveal that the nature and circumstances surrounding the incidents were sufficient to place a reasonable person on notice that actionable conduct may have been involved.  Discovery will also shed light on whether neurodegenerative disorders and diseases are latent conditions caused by the occurrence of injuries of which a reasonable person should have been aware, as the Big Ten asserts.  Here at the pleading stage, however, the alleged facts and disputed issues stand in stark contrast to *Golla*, which was a summary judgment case.

As a result, the Court does not believe that Plaintiffs' complaint indicates that their claims are barred by the two-year statute of limitations. *See Vector-Springfield Props, Ltd. v. Cent. Ill. Light Co.*, 108 F.3d 806, 810 (7th Cir. 1997) (noting that "the point in time when a reasonable person with similar information should have realized he had been injured and that the injury had been wrongfully caused is generally a question to be decided by the trier of fact") (citing *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 981 (Ill. 1981)).

In the alternative, the Big Ten seeks a more definite statement under Rule 12(e) because Plaintiffs have failed to allege when their claims accrued. However, as the Seventh Circuit stated in *Chapman v. Yellow Cab Cooperative*, 875 F.3d 847, 848 (7th Cir. 2017), "it is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each." "It is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint[.]" *Id.* (internal quotation marks and citations omitted). As such, "Rule 12(e) cannot be used to turn federal civil procedure into a fact-pleading or code-pleading system." *Id.* at 849. Rather, Rule 12(e) motions are appropriate only when the complaint "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Here, given that Plaintiffs are not required to anticipate or plead around the affirmative defense of statute of limitations in the first instance, *Leavell v. Kieffer*, 189 F.3d 492, 494 (7th Cir. 1999), granting a request for a more definite statement to solidify the defense is particularly inapt. The Big Ten's request for a more definite statement is therefore denied.

## B. Fraudulent Concealment Exception to the Applicable Statute of Limitations

Under Illinois law, "[i]f a person liable to an action fraudulently conceals the cause of such action," the statute of limitations does not begin to run until the plaintiff "discovers that he or she

has such cause of action." 735 Ill. Comp. Stat. 5/13–215. The Big Ten argues that, to the extent that Plaintiffs intend to rely upon the doctrine of fraudulent concealment to extend the two year limitations period, they cannot do so because they have not pleaded the fraudulent concealment exception with particularity as required by Rule 9(b). But, again, the statute of limitations is an affirmative defense, and a plaintiff has no obligation—under Rule 9(b) or otherwise—to plead around it in the complaint. *See United States v. N. Tr. Co*., 372 F.3d 886, 888 (7th Cir. 2004) ("[C]omplaints need not anticipate and attempt to plead around defenses."); *Resnick v. Schwartz*, No. 17 C 4944, 2018 WL 4191525, at *6 (N.D. Ill. Sept. 3, 2018) ("[T]he facts underlying the fraud-or-concealment exception need not be pled in the Amended Complaint at all, let alone meet the requirements of Rule 9(b)'s particularity standard.").

The Big Ten's reliance upon *Pitts v. Unarco Industries, Inc.*, 712 F.2d 276, 278–79 (7th Cir. 1983), is misplaced. Because the case was appealed after summary judgment had been granted in the defendant's favor and because the plaintiff in *Pitts* did not appeal the dismissal of the fraudulent concealment claim, the *Pitts* court had no occasion to consider the sufficiency of the allegations. Accordingly, the *Pitts* court's brief mention of Rule 9(b) is dicta, and inconsistent with more recent Seventh Circuit law. *See Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). The Court therefore denies the Big Ten's motion to dismiss on this ground.

## III.     Affirmative Fraudulent Concealment Claim (Count 2)

Both Defendants move to dismiss Plaintiffs' affirmative fraudulent concealment claim. As an initial matter, the NCAA argues that it is not clear that Indiana law recognizes such a claim. And even if it does, the NCAA contends that Plaintiffs' allegations fail to satisfy the heightened

pleading standard of Rule 9(b). In turn, the Big Ten argues that Plaintiffs have failed to allege certain elements of the claim.

It is true that two federal district courts have held that fraudulent concealment is not an independent cause of action under Indiana law. *See Gonzalez v. ADT LLC*, 161 F. Supp. 3d 648, 655 (N.D. Ind. 2016), *Fikes v. Whitesell*, No. 4:11-CV-00034-TWP, 2011 WL 5025523, at *7 (S.D. Ind. Oct. 20, 2011). But the cases that those courts cited do not stand for that proposition. Rather, the cited cases merely hold that a defendant may be estopped from asserting the statute of limitations under the doctrine of fraudulent concealment, and they do not address the issue of whether fraudulent concealment is a standalone claim. *See Doe v. United Methodist Church*, 673 N.E.2d 839, 844 (Ind. Ct. App. 1996) (cited in *Gonzalez*); *Ayers v. State Farm Mut. Auto. Ins. Co.*, 558 N.E.2d 831, 833 (Ind. Ct. App. 1990) (cited in *Fikes*). Accordingly, I respectfully disagree with the holdings in *Gonzalez* and *Fikes*.

By contrast, Indiana courts have consistently recognized fraudulent concealment as an independent cause of action. *See, e.g., DeVoe Chevrolet-Cadillac, Inc. v. Cartwright*, 526 N.E.2d 1237, 1240 (Ind. Ct. App. 1988); *Brown v. Ind. Nat'l Bank*, 476 N.E.2d 888, 891 (Ind. Ct. App. 1985); *Barnd v. Borst*, 431 N.E.2d 161, 168 (Ind. Ct. App. 1982); *Grow v. Ind. Retired Teachers Cmty.*, 271 N.E.2d 140, 145 (Ind. Ct. App. 1971). The NCAA's motion to dismiss on the basis that Indiana law does not recognize a claim of fraudulent concealment is thus denied.

Turning to the claim itself, to state a fraudulent concealment claim under Indiana law, a plaintiff must allege: "(1) the wrongdoer had a duty to disclose certain facts to another, (2) it knowingly failed to do so, and (3) the other justifiably relied upon such non-disclosure to his detriment." *DeVoe*, 526 N.E.2d at 1240; *see Cent. Nat'l Bank of Greencastle v. Shoup*, 501 N.E.2d 1090, 1097 (Ind. Ct. App. 1986) ("Fraud generally comprises all acts, omissions, and concealments

involving a breach of legal or equitable duty and resulting in damages to another.") (internal quotation marks omitted). "The fraud may be constructive in a sense that there may not be any active intentional purpose to deceive or defraud, yet the action is so prominent and misleading as to induce detrimental reliance." *See Barnd*, 431 N.E.2d 161, 168 (Ind. Ct. App. 1982) (internal quotation marks omitted). "The party asserting fraud bears the burden of establishing the wrongdoer's duty to disclose." *Brown*, 476 N.E.2d 888, 891 (Ind. Ct. App. 1985).

The Big Ten argues Plaintiffs have failed to allege that they could not have discovered the truth through reasonable inquiry or inspection. Big Ten's Mem. Supp. Mot. Dismiss at 12. In support, the Big Ten relies on *Smith v. Taulman*, a case in which the plaintiff appealed the trial court's denial of a motion to compel and its entry of summary judgment against him. 20 N.E.3d 555, 566–67 (Ind. Ct. App. 2014). The *Smith* defendants had raised a defense to the plaintiff's fraudulent concealment claim, asserting that the claim could not be predicated on a failure to disclose facts, where (1) information was equally accessible to the plaintiff as to the defendants, and (2) the truth was ascertainable by exercise of reasonable diligence. *Id.* In response, the plaintiff moved to compel discovery to determine whether the defendants had withheld information from him. *Id.* On those facts, the appellate court vacated the trial court orders and remanded the case for further proceedings. *Id.* But *Smith*—like the cases it cites—was decided on summary judgment and, therefore, does not stand for the proposition that a plaintiff must plead that he or she was unable to discover the truth through reasonable inquiry or inspection.

The Big Ten also contends that Plaintiffs have failed to plead that it had a duty to disclose any facts regarding concussions, because the complaint does not allege the existence of a confidential or fiduciary relationship. Big Ten's Mem. Supp. Mot. Dismiss at 12. However, under Indiana law, a duty to disclose also may exist where "one party may be in the unique possession

of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *See Am. United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 702 (Ind. Ct. App. 2004).

Here, according to Plaintiffs, the NCAA was originally founded in 1906 to protect college football players from head injuries, which were occurring at an alarming rate. Compl. ¶¶ 29–30. Furthermore, the NCAA is specifically charged with safeguarding the health and well-being of student-athletes. *Id.* To this end, from time to time, the NCAA has conducted concussion studies to determine the risks and effects of concussions and, over time, has implemented guidelines and rules to try to mitigate those risks. *Id.* ¶¶ 66–67, 122. And, like the NCAA, the Big Ten is also responsible for protecting the health and safety of student-athletes. *Id.* ¶¶ 36–37, 41. Moreover, as compared to Plaintiffs, the Big Ten and the NCAA were in a superior position to know, and to mitigate, the risks of concussions and other traumatic brain injuries. *Id.* ¶ 42. What is more, given the Big Ten's and the NCAA's superior and unique vantage point on health and safety issues, Plaintiffs depended upon them for treatment of, and guidance on, head injuries and concussions. *Id.* ¶¶ 119–20. When these allegations are construed as a whole in a light most favorable to Plaintiffs, they sufficiently assert the type of relationship that gives rise to a duty on the part of the NCAA and the Big Ten to disclose facts regarding the risks and effects of traumatic brain injury to their student-athletes. Accordingly, the Big Ten's motion to dismiss Plaintiffs' fraudulent concealment claim is denied.

As for the NCAA, it contends that Plaintiffs have failed to plead fraudulent concealment with particularity under Rule 9(b), because the complaint does not allege who at the NCAA concealed information, what was concealed, or when, where, and how the fraud took place. *See United States ex rel. Lusby*, 570 F.3d at 853. "[D]efendants are entitled to be apprised of the roles they each played in the alleged scheme, and absent a compelling reason, a plaintiff is normally not

entitled to treat multiple . . . defendants as one entity." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir. 1994).

In this regard, Plaintiffs allege the following. From 1996 to 2001, while Plaintiffs played football for Purdue, the NCAA promulgated, and the Big Ten implemented, official safety guidelines and rules. Compl. ¶¶ 115–16. These guidelines and rules omitted appropriate safety and return-to-play procedures regarding concussive and subconcussive impacts. *Id.* ¶ 122. The NCAA, by promulgating these rules, and the Big Ten, by implementing them, fraudulently concealed their knowledge that: (1) repetitive head impacts in football games and full-contact practices created a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts; and (2) that same risk was created by permitting players to return prematurely to physical activity after sustaining a subconcussive or concussive impact. *Id.* ¶¶ 115–17. As Plaintiffs see it, by concealing these facts, the NCAA and the Big Ten intended to induce Plaintiffs to have a false belief that they could safely continue to play football after sustaining such injuries, even though they themselves knew that Plaintiffs greatly increased their risk of long-term injury and illness by doing so. *Id.* ¶¶ 118, 122.

Further, as college students, Rose and Stratton lacked much of the scientific information that the NCAA and the Big Ten possessed with regard to these issues. *See* ¶ 42. Such an imbalance of information serves to relax Rule 9(b)'s particularity requirement, especially given Plaintiffs' allegations that the NCAA and the Big Ten not only had this information, but kept it from them. *See Jepson*, 34 F.3d at 1328 (citing *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1567 n.7 (7th Cir.), *cert. denied*, 502 U.S. 903 (1991)); *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998); *see also In re Nat'l Hockey League Players' Concussion Injury Litig.*, No. MDL 14-2551 (SRN), 2015 WL 1334027, at *10 (D. Minn. Mar. 25, 2015). Thus, in the context

19

of the allegations in this case, Plaintiffs have satisfied the requirements of Rule 9(b), and the NCAA's motion to dismiss Plaintiffs' fraudulent concealment claim is therefore denied.

## IV.     Breach of Express Contract Against the NCAA (Count 3)

Next, the NCAA argues that Plaintiffs have failed to state a claim for breach of an express contract.[2]  "The elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff."  *WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 695 (Ind. Ct. App. 2014).

Plaintiffs allege that, in order to play football for Purdue, they were required to enter into an express contract with the NCAA.  Compl. ¶ 125.  In exchange for Plaintiffs' promise to play football and to abide by the NCAA's regulations, the NCAA promised to:  (1) conduct intercollegiate athletics in a manner designed to protect and enhance the physical and educational well-being of student-athletes; and (2) require that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes.  *Id.* ¶ 126.  Plaintiffs further attest that they fulfilled all of their obligations under this contract by playing football and complying with the NCAA's regulations.  *Id.* ¶ 127.  In addition, Plaintiffs assert that, by concealing the risks of brain injuries, the NCAA failed to abide by its contractual obligations in not acting to protect Plaintiffs' health and physical well-being.  *Id.* ¶ 128.  Finally, Plaintiffs allege that, as a direct and proximate result of the NCAA's breach, they experienced repetitive subconcussive brain impacts and have a significantly increased risk of developing neurodegenerative disorders and diseases.  *Id.* ¶ 129.

---

[2]     The NCAA also takes issue with Plaintiffs' failure to attach the written contracts as exhibits to their complaint.  *See* NCAA's Reply Supp. Mot. Dismiss at 8.  But the attachment of a written contract to a complaint is not required under the federal rules.  *RehabCare Grp., E., Inc. v. Camelot Terrace, Inc.*, No. 11 C 6557, 2012 WL 1246560, at *5 (N.D. Ill. Apr. 13, 2012).

These factual allegations, while sparse, are enough to plead a plausible claim for breach of an express contract, and the NCAA's motion to dismiss is denied.

## V.    Breach of Implied Contract (Count 4)

The NCAA and the Big Ten also seek to dismiss Plaintiffs' breach-of-implied-contract claim.[3] Implied contracts are decidedly different from express contracts. An implied contract is "not created or evidenced by the explicit agreement of the parties." *Wayt v. Town of Crothersville*, 866 F. Supp. 2d 1008, 1018–19 (S.D. Ind. 2012). Rather, an implied contract is "inferred by the law, as a matter of reason and justice from [the parties'] acts or conduct, [with] the circumstances surrounding the transaction making it a reasonable, or even a necessary, assumption that a contract existed between them by tacit understanding." *Id.*

To state a claim of breach of implied contract under Indiana law, a plaintiff cannot merely allege that "he had a contract with the defendant, gave the defendant consideration, and the defendant breached the contract." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). Rather, to withstand a motion to dismiss, "a claim of breach of implied contract requires facts concerning the promises allegedly made by the parties to the contract, how those promises were communicated and how the exchange of obligations created an implied contract." *Robinson v. Leonard-Dent*, No. 3:12CV417-PPS, 2013 WL 5701067, at *13 n.5 (N.D. Ind. Oct. 18, 2013); *see Bissessur*, 581 F.3d at 603.

Defendants correctly point out that Plaintiffs have not alleged any acts or conduct on the part of either the NCAA or the Big Ten that would constitute a communication to Plaintiffs of a

---

[3]    Plaintiffs have pleaded their breach-of-implied-contract claim against the NCAA in the alternative to their breach-of-express-contract claim covering the same subject matter. *See Engelbrecht v. Prop. Developers, Inc.*, 296 N.E.2d 798, 801 (Ind. Ct. App. 1972) ("An implied contract cannot exist where an express contract covers the identical subject.").

promise to undertake a contractual obligation. And the mere existence of the NCAA's constitution and bylaws is insufficient to constitute the NCAA's communication of a promise to Plaintiffs. *See* Compl. ¶ 132 (alleging that the NCAA's promises were set forth in the NCAA's constitution and bylaws). Similarly, the Big Ten's agreement with the NCAA to adhere to the NCAA's constitution and bylaws falls short of evidencing a communication of a promise to Plaintiffs. *See id.*

Plaintiffs rely upon *Cordova v. University of Notre Dame Du Lac*, No. 3:11-CV-210 RM, 2011 WL 6257290, at *5 (N.D. Ind. Dec. 13, 2011), but that case is easily distinguishable. There, the court denied a motion to dismiss an implied-contract claim where a student-employee alleged that her university had communicated its promises directly to her in form of a student handbook, as well as student and employee anti-discrimination policies. *Id.* Here, there is no allegation that the NCAA or the Big Ten communicated promises directly to Plaintiffs. Plaintiffs cannot merely allege the existence of statements listed in NCAA or Big Ten documents; rather, Plaintiffs must allege facts indicating that the NCAA and Big Ten directed the statements in those documents to communicate a promise to them. Accordingly, the Court grants Defendants' motion to dismiss and dismisses Count 4 without prejudice.

## VI.     Breach of Contract as Third-Party Beneficiaries Against the NCAA (Count 5)

In Count 5, Plaintiffs allege that they were the third-party beneficiaries of an agreement between the NCAA and Purdue regarding the implementation of certain NCAA rules and regulations. The NCAA argues that this claim must fail because the complaint does not sufficiently allege the existence of such a relationship.

"Under Illinois law, a cause of action based on a contract may be brought . . . by an intended third-party beneficiary of the contract." *Kaplan v. Shure Bros.*, 266 F.3d 598, 602 (7th Cir. 2001) (citations omitted); *see Olson v. Etheridge*, 686 N.E.2d 563, 566 (Ill. 1997). "For an intended

third-party beneficiary to enforce contract terms, the liability of a promisor to the beneficiary must affirmatively appear from the language of the instrument, and the contract must be made for the *direct* benefit of the third party." *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 734 (7th Cir. 2005) (citations and internal quotation marks omitted) (emphasis in original). "[T]he contract does not have to specifically name the third-party beneficiary, as long as it defines a third-party by description of class, and the parties have identified the plaintiff at the time performance is due." *Zurich Capital Mkts. Inc. v. Coglianese*, 2005 WL 1950653, at *8 (N.D. Ill. Aug. 12, 2005) (citing *Altevogt v. Brinkoetter*, 421 N.E.2d 182, 187 (Ill. 1981)).

Here, the allegations state that the NCAA and Purdue entered into an express contract, whereby Purdue University agreed to abide by the NCAA's rules and regulations. Compl. ¶ 137. Although Plaintiffs assert in a conclusory manner that "Plaintiffs and the Class are the intended third-party beneficiaries of the contract between the NCAA and Purdue University," nowhere do they allege that the contract itself includes any provision that evidences the intention of the NCAA and Purdue to benefit them. *See id.* ¶¶ 138, 139. Rather, Plaintiffs claim that the parties' intent appears elsewhere in the NCAA's rules, regulations, purpose, and principles. *Id.* Under Illinois law, this is not enough. *See Vilter Mfg. Co. v. Loring*, 136 F.2d 466, 469 (7th Cir. 1943) (affirming the grant of a motion to dismiss where the defendant's obligation to the plaintiff was not "borne out by the contract"). The Court therefore grants the NCAA's motion to dismiss this claim, and Count 5 is dismissed without prejudice.

## VII. Unjust Enrichment (Count 6)

Both the NCAA and the Big Ten move to dismiss Plaintiffs' unjust-enrichment claim. Under Indiana law, claims of unjust enrichment and quantum meruit have the same purpose, as well as the same elements. *Woodruff v. Ind. Family & Soc. Servs. Admin.*, 964 N.E.2d 784, 791

(Ind. 2012). These claims are "a legal fiction invented by the common-law courts in order to permit a recovery . . . where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Id.* "Indiana courts articulate three elements for these claims: (1) a benefit conferred upon another at the express or implied request of this other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment." *Id.* However, a person who "labors without an expectation of payment cannot recover." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991); *Biggerstaff v. Vanderburgh Humane Soc.*, 453 N.E.2d 363, 364 (Ind. Ct. App. 1983).

According to Plaintiffs, the NCAA and the Big Ten received significant broadcasting, merchandising, and ticket revenues from their football games. Compl. ¶ 143. Plaintiffs assert that, because Defendants have refused to reimburse Plaintiffs for the injuries that they suffered while playing football, Defendants' retention of those revenues would be unjust. *Id.* ¶ 145.

But, as Defendants note, Plaintiffs have not alleged that either the Big Ten or the NCAA requested that Plaintiffs play football for Purdue. Nor have Plaintiffs alleged that they expected Defendants to pay their medical expenses while at Purdue. At most, the allegations indicate that Rose and Stratton expected Defendants to provide a safe playing environment that protected their health and safety. But that is not equivalent to an expectation of payment or similar pecuniary benefit. Because Plaintiffs have failed to allege the elements of an unjust enrichment claim, the Court grants Defendants' motions to dismiss and dismisses Count 6 without prejudice.

## Conclusion

For the reasons provided above, the NCAA's and the Big Ten's motions to dismiss [12][16] are granted in part and denied in part. The Court grants their motions to dismiss the breach-of-implied-contract and unjust-enrichment claims (Counts 4 and 6) as well as the NCAA's motion to dismiss the breach-of-express-contract-as-third-party-beneficiaries claim (Count 5). In all other respects, the motions, including the Big Ten's motion for a more definite statement, are denied. To the extent that Plaintiffs believe they can amend Counts 4, 5 and 6 to comply with this order, they should move to file an amended complaint within 21 days. If no motion is filed, the Court will presume that Plaintiffs no longer wish to pursue these counts.

**IT IS SO ORDERED.**                    **ENTERED    9/28/18**

_____
**John Z. Lee**
**United States District Judge**